UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| RICHARD A. PITINO | ) |
| Plaintiff | ) |
| v. | ) Case No. 3:17-CV-639-DJH |
| ADIDAS AMERICA, INC. | ) |
| Defendants | ) |

## VERIFIED COMPLAINT

The Plaintiff, Richard A. Pitino (Coach Pitino), states his complaint against Adidas America, Inc., (Adidas), as follows:

### Preliminary Statement

1. This is state law tort claim for damages resulting from an athletic apparel company's outrageous conduct in conspiring to funnel money to the family of a college basketball recruit. Specifically, Coach Pitino alleges that Adidas outrageously conspired to funnel money to the family of a recruit of the University of Louisville men's basketball team — a team that he coached for more than fifteen years — all without Coach Pitino's knowledge, participation, or acquiescence. The public disclosure of Adidas' outrageous and unlawful conspiracy has made it appear, and Adidas knew or recklessly avoided knowing that it would make it appear, that Coach Pitino had known about, participated in, acquiesced in, or otherwise condoned these outrageous practices.

2. That could not be further from the truth. Coach Pitino has striven to ensure that the University of Louisville men's basketball program operates cleanly,

properly, and in strict compliance with all National Collegiate Athletic Association (NCAA), Atlantic Coast Conference (ACC), and other regulatory requirements. Coach Pitino has demanded that his assistant coaches and staff members strictly comply with all such regulatory requirements. He never has authorized, tolerated, participated in, or otherwise condoned giving improper benefits to recruits or players, or to their families, especially as an inducement to have recruits join the University of Louisville men's basketball program.

3. Adidas knew, or recklessly avoided knowing, that Coach Pitino's public and private standing and reputation hinged on him running a clean, proper, and strictly compliant men's basketball program. This is particularly true in light of the recent, well-publicized, matter resulting from an assistant coach's improper provision of escorts to University of Louisville men's basketball players and recruits. That matter resulted in the NCAA's imposition of sanctions — currently under appeal — against the University of Louisville and Coach Pitino. In that case, the NCAA's infractions committee concluded that Coach Pitino did not participate in, nor have knowledge about, the provision of improper benefits; it nevertheless concluded that Coach Pitino had failed to properly monitor his staff, and thus suspended him for the first five ACC games of the 2017-18 season. Given the imposition of sanctions in 2017, and the current pendency of Coach Pitino's appeal of those sanctions, Adidas knew, or recklessly avoided knowing, that Coach Pitino's public and private standing and reputation would be severely damaged by a new scandal involving the payment of money to basketball recruits or their families.

4. Notwithstanding that, during the spring and summer of 2017 — that is, during the precise time that Coach Pitino was appealing the imposition of NCAA

2

sanctions against him, — Adidas apparently conspired with others to improperly funnel money to the family of a University of Louisville basketball recruit. Adidas' outrageous and unlawful actions, and the public disclosure of those actions, have resulted in grave damage to Coach Pitino's public and private standing and reputation, causing him extreme embarrassment, humiliation, and emotional distress. In this lawsuit, he seeks an award of compensatory and punitive damages against Adidas for its outrageous and unlawful conduct. (His claims against Adidas, and the damages caused by Adidas' actions, are entirely independent of, and separate from, any claims or damages related to Coach Pitino's employment.) This lawsuit is about more than just money; it is Coach Pitino's vehicle for proving that he had nothing to do with Adidas' outrageous, wrongful, and illegal conspiracy.

### Jurisdiction and Venue

5. This Court has jurisdiction under 28 U.S.C. § 1332, which provides for original district court jurisdiction over cases between citizens of diverse states.

6. Courts within the Commonwealth of Kentucky have long-arm jurisdiction over this claim against Adidas under KRS 454.210(2)(a)(1) through (a)(4).

7. Venue is proper because some of Adidas' wrongful actions, or those of its co-conspirators, took place in Jefferson County, Kentucky, and/or because Adidas' wrongful actions caused damage in Jefferson County, Kentucky.

### Parties

8. Plaintiff, Richard A. Pitino, is an adult citizen of Florida. At the time of the events described in this complaint, Coach Pitino lived in Jefferson County, Kentucky.

9. Defendant, Adidas America, Inc., is an Oregon corporation with its

3

principal place of business in Portland, Oregon. Adidas does business in Louisville, Jefferson County, Kentucky, including providing athletic apparel to members of the University of Louisville men's basketball team, and engaging in business relationships with the University of Louisville, its athletic department, and its employees.

**Factual Allegations**

**A.     Background**

10.     Coach Pitino served as the head coach for the University of Louisville men's basketball team from 2001 to October 16, 2017. He has coached college and professional basketball for more than 40 years. He has taken three college teams to the NCAA Final Four, and two of his teams have won the NCAA National Championship. In 2013, he was enshrined in the Basketball Hall of Fame.

11.     Adidas America, Inc., is the North American subsidiary of Adidas AG, a Germany-based multinational corporation. Adidas designs and manufactures athletic shoes, clothing, sportswear, and accessories.

12.     According to Bloomberg, a well known source for business news, Mark King (King) became Adidas America's CEO in 2014. At that time, he announced his plan to compete more aggressively to outfit college and university teams, thus seeking to appeal to younger consumers. Bloomberg quoted King as saying, in 2015, that Adidas had "to go out and sign a bunch of colleges." At that time, Adidas had already supplanted Nike as the official outfitter for Arizona State University and the University of Miami. It later added the Georgia Institute of Technology, Indiana University, and Kansas University. In August 2017, the University of Louisville and Adidas announced a ten-year, $160 million, extension of its contract as the University's athletic outfitter.

4

13. It is and was in Adidas' interest to have the teams for schools that Adidas outfits succeed, especially because high-profile television coverage of championship events would show athletes wearing Adidas products. It likewise is and was in Adidas' interest for top athletes to attend the schools that Adidas outfits, because that would increase the chance of those teams' success. And it was in Adidas' long-term interest to build relationships with recruits early in their careers in order to influence them to sign contracts with Adidas once they became professional athletes.

14. Despite — or because of — the huge financial interest that so many individuals, colleges, and corporations (including Adidas) have in college athletics, the NCAA strictly regulates how and when colleges may recruit athletes, and what benefits they may give athletes. NCAA regulations categorically prohibit the payment of money to athletes, their families, or on their behalf, as an inducement to attend a particular school.

15. Adidas and its employees knew of these NCAA regulations. They knew that violating these regulations could benefit Adidas financially. They also knew that, to benefit from violating these regulations, they would have to do so secretly, covering up their improper behavior as well as possible.

**B.    The Unlawful Conspiracy**

16. According to the recently-unsealed complaint (Complaint) in *United States of America v. James Gatto, et al.*, Crim. No. 17-MJ-7120 (U.S. District Court for the Southern District of New York), "since 2015, the [Federal Bureau of Investigation] FBI and [United States Attorney's Office for the Southern District of New York] USAO have been investigating the criminal influence of money on coaches and athletes who

5

participate in intercollegiate basketball governed by the NCAA." In that Complaint, John Vourderis, a Special Agent (SA) with the FBI, detailed what he learned from his participation in the investigation, his review of publicly available information, and his conversations with other law enforcement agents who have reviewed that information. The allegations in the following paragraphs 17-23 are drawn directly from the USAO Complaint, and Coach Pitino alleges all of them upon his best information and belief. Quotation marks identify verbatim quotes from the Complaint. The Ccomplaint refers to a specific Athletic Apparel Company as "Company-1," a specific university as "University-6," and a specific coach as "Coach-2." Coach Pitino believes that those unnamed entities are Adidas, the University of Louisville, and him, and refers to them by their names below. The Complaint also refers to a recruit as "Player-10." Although Coach Pitino believes that he knows the identity of that player, and believes him to be a University of Louisville basketball recruit, he chooses to refer to him here as "UL Recruit-10."

17. James Gatto (Gatto) is Adidas' head of Global Sports Marketing — Basketball. In that capacity, he "appears to oversee significant components of Adidas' high school and college basketball programs, including facilitating payments to players and their families."

18. Merl Code (Code) is affiliated with Adidas' "high school and college basketball programs, and has participated in organizing payments from [Adidas] to players and their families …"

19. From at least about May 2017 to September 2017, Gatto and Code conspired with others to "illicitly funnel approximately $100,000 from [Adidas] to the

family of [UL Recruit-10]." They also assisted one or more coaches at the University of Louisville to secure UL Recruit-10's commitment to play at the University of Louisville. And they sought to ensure that UL Recruit-10 ultimately retained sports agents, advisors, or managers involved in the conspiracy, and signed with Adidas after entering the National Basketball Association (NBA).

20. The bribe money described in ¶ 19 was structured so as to conceal it from the NCAA and officials at the University of Louisville. That structure of concealment included having Adidas wire money to third party consultants, who then facilitated cash payments to UL Recruit-10's family. It also included having the conspirators make false certifications to the University of Louisville.

21. In May 2017, Gatto and Code, along with other conspirators, agreed to funnel $100,000, in four installments, from Adidas to the family of UL Recruit-10. To do this, Gatto and Code "generate[d] a sham purchase order and invoice ostensibly to justify using [Adidas'] funds," because they "could not lawfully pay the family of" UL Recruit-10, and could not risk that these prohibited payments be publicly revealed. In July 2017, Code, along with other conspirators, arranged for an entity other than Adidas "to make an initial $25,000 payment to [UL Recruit-10's] family on [Adidas'] behalf, to be later reimbursed by [Adidas]." Code purportedly discussed the need for this payment system, explaining how athletic apparel companies masked other, similar payments to high school athletes. Code specifically asked for the other entity to provide the funds "with the understanding that they will be reimbursed" by Adidas. Code also suggested that the payment be in cash "for cleanliness and lack of questions." He also said that "you guys are being introduced to … how stuff happens with kids and getting into

particular schools," and that "this is ... one of those instances where we needed to step up and help one of our flagship schools in [the University of Louisville] ... secure a five star caliber kid. Obviously that helps ... our potential business ... and that's an [Adidas-sponsored] school." In July 2017, conspirators made the first $25,000 payment to the family of UL Recruit-10.

22.     Later in July 2017, Code spoke with another conspirator, who had expressed concern with Code and Gatto's delay in securing the funds from Adidas to pay UL Recruit-10. Code said that he might have to "lean on" a senior Adidas executive in order to finance the payments. Code also discussed how Gatto and other Adidas employees were accounting for the unlawful transfer of funds to UL Recruit-10 "by booking it on [Adidas'] records as a payment to an outside organization affiliated with Code." When the other conspirator "expressed surprise that Gatto was putting the payments on [Adidas'] books at all, Code confirmed that Gatto had identified it" as a payment to Code's organization, so — while it was on the Adidas books — it was not "on the books for what it's actually for."

23.     In a mid-August 2017 telephone conversation, a conspirator "confirmed that he had facilitated the first $25,000 payment to [UL Recruit-10] and that Code had reimbursed him on Adidas' behalf. Banking records reflect that the conspirator had deposited a $25,000 check into a company that he owns; the check was issued from a bank account held, in part, in the name of an AAU basketball program sponsored by Adidas.

24.     At all relevant times, Gatto, Code, and other Adidas employees participating in the conspiracy acted within the scope of their employment, furthering the

8

interests and goals of their employer, and seeking to maximize the success of their job performance. Upon information and belief, at least one of the communications between Adidas employees and other conspirators, and/or at least one of the overt acts by Adidas employees or other conspirators, took place in part in Louisville, Jefferson County, Kentucky.

**C.     NCAA Sanctions**

24.     In 2015, a book alleged that a staff member of the University of Louisville men's basketball team had improperly provided escorts for team players and recruits. The widely-publicized matter led the University of Louisville to self-impose sanctions, including its decision not to participate in post-season basketball tournaments for the 2015-16 season. After a full investigation and hearing, in June 2017 the NCAA Committee on Infractions imposed sanctions against the basketball team and against Coach Pitino.

25.     Although the committee did not find that Coach Pitino knew about, approved, acquiesced in, or otherwise condoned or participated in the provision of improper benefits, it faulted him for failing to properly monitor his staff. It therefore suspended him for the first five ACC games during the 2017-18 season. That decision is currently under appeal.

**D.     Coach Pitino**

26.     Coach Pitino had no part — active, passive, or through willful ignorance — in the conspiracy described above.

27.     Coach Pitino never has had any part — active, passive, or through willful ignorance — in any effort, successful or unsuccessful, completed or abandoned, to pay

any recruit, or any family member of a recruit, or anyone else on a recruit's behalf, as an inducement to attend the University of Louisville.

28. Coach Pitino knows and has communicated with Gatto. That is not surprising, because Adidas has outfitted the University of Louisville men's basketball team for several years, and the University and Adidas signed a $160 million, ten year, contract extension in August 2017. At no time have Coach Pitino and Gatto discussed — overtly, covertly, in code, through nuance, or in any other way — the provision of improper benefits to any University of Louisville basketball player or recruit.

29. On the contrary, Coach Pitino has striven to ensure that the University of Louisville men's basketball program operates cleanly, properly, and in strict compliance with all regulatory requirements. He demands that his assistant coaches and staff members strictly comply with all such regulatory requirements. And that has been particularly true since the revelations in the 2015 scandal, and in light of the 2017 NCAA sanctions.

### E. Injury

30. Basketball coaches — like nearly all employees — are judged on more than their successful job performance. They are judged on their work ethic, integrity, adherence to rules, and honesty. But because basketball coaches are paid far more than most employees, and because their work is so public, adverse views of their integrity and honesty become magnified.

31. It matters deeply to Coach Pitino what people think of his integrity and honesty. Being involved with the illegal and wrongful payment of money to recruits, or on their behalf, necessarily and properly tarnishes the reputation of those so involved.

That is reason enough (in addition to regulatory prohibitions) for Coach Pitino not to be so involved.

32. Adidas knew, or recklessly avoided knowing, that Coach Pitino's reputation for honesty and integrity would be seriously damaged by the perception — even if unfounded — that he was involved with the illegal and wrongful payment of money to recruits, or on their behalf. Despite this, Adidas and its employees apparently proceeded with the unlawful and wrongful conspiracy described above.

33. The public disclosure of Adidas' actions, and those of its employees, has in fact seriously damaged Coach Pitino's reputation for honesty and integrity. In the weeks since Adidas' actions, and those of its employees, has become public, Coach Pitino has been vilified, ridiculed, and criticized in the local and national media, on social media, and in public and private communications. It has been difficult and painful for Coach Pitino and his family to appear in public anywhere, especially in Louisville, where they lived. That would be an inevitable consequence for Coach Pitino had he participated or acquiesced — in any form — in Adidas' actions, or those of its employees. But he did not. And suffering that consequence because he now is publicly perceived as having participated or acquiesced in Adidas' actions, or those of its employees, is simply wrong. It would not have happened but for the wrongful actions of Adidas and its employees.

34. Adidas' actions, and those of its employees acting within the scope of their employment, furthering the interests and goals of their employer, and seeking to maximize the success of their job performance, thus has caused Coach Pitino profound embarrassment, humiliation, and emotional injury, for which he seeks compensation.

35. In addition, Adidas' actions, and those of its employees acting within the

11

scope of their employment, furthering the interests and goals of their employer, and seeking to maximize the success of their job performance, constitutes oppression, malice, or fraud, so as to warrant the imposition of punitive damages.

### Claim for Relief

### Cause of Action: Tort of Outrage

36. Kentucky recognizes the tort of outrage, which authorizes the recovery of damages from one who, by extreme and outrageous conduct, intentionally or recklessly causes emotional distress to another.

37. This case is a textbook example of that tort. As detailed above, Adidas and its employees engaged in extreme and outrageous conduct by bribing a University of Louisville basketball recruit, or his family, to join the University of Louisville men's basketball team. As also detailed above, that conduct intentionally or recklessly caused emotional distress to Coach Pitino. And it was obviously foreseeable that public disclosure of Adidas' wrongdoing, and that of its employees, would cause emotional distress to Coach Pitino.

38. The tort of outrage is, of course, a gap-filler, meant to apply when no other traditional tort does. And no other traditional tort appears to apply here. Adidas could not have committed an employment-related tort, because it was not Coach Pitino's employer. It could not have committed a negligent tort, because its conduct, and that of its employees, was quite deliberate. It could not have engaged in tortious interference with contract, because it had no desire to adversely affect Coach Pitino's contracts with his employer or others; on the contrary, Adidas' financial interests were best served by keeping its actions secret, and thus having no effect on Coach Pitino's contracts. It could

not have defrauded Coach Pitino, because its fraudulent actions were directed at the University of Louisville, which provided a college scholarship to an ineligible recruit. And it could not be accused of unjust enrichment, because any enrichment it gained was not at Coach Pitino's expense.

39. For these reasons, and based on the facts detailed above, Adidas has committed the tort of outrage, for which it is liable for compensatory and punitive damages, in amounts to be proven at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Coach Pitino requests the following:

1. Trial by jury of all issues so triable;

2. Judgment against Adidas for committing the tort of outrage;

3. An award of compensatory damages against Adidas, in an amount to be proven at trial, for the injuries the Coach Pitino has suffered because of Adidas' wrongful actions;

4. An award of punitive damages, because of Adidas' oppression, malice, or fraud;

5. Recovery of all litigation costs allowed by Kentucky law; and

6. All other relief to which he is entitled.

Respectfully Submitted,

*/s/Stephen B. Pence*
Stephen B. Pence
PENCE & WHETZEL, PLLC
9300 Shelbyville Road, Suite 1205
Louisville, KY 40223
(502) 736-6200
steve@pencelegal.com

*/s/ Michael A. Valenti*
Michael A. Valenti
VALENTI HANLEY PLLC
401 W. Main Street, Suite 1950
Louisville, KY 40202
(502) 568-2100
mvalenti@vhrlaw.com

*Counsel for Plaintiff*

14

## VERIFICATION

I verify that the facts contained in this complaint are true and accurate, to the best of my knowledge, information, and belief.

_Richard A. Pitino_
Richard A. Pitino

Subscribed and sworn before me by Richard A. Pitino on October 17, 2017.

_____
Notary Public, State at Large

My commission expires: _____

CLARECE DEPKIN
MY COMMISSION #FF118593
EXPIRES: JUL 14, 2018
Bonded through 1st State Insurance

15